IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Michael Ladale Reeves, ) | |
| ) | Civil Action No. 6:08-4031-HMH-WMC |
| Plaintiff, ) | |
| ) | **O R D E R** |
| vs. ) | |
| ) | |
| Nuvox Communications, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 57). In his complaint, the plaintiff, who is proceeding *pro se*, alleges that the defendant, his former employer, discriminated against him and retaliated against him in violation of the Americans with Disabilities Act ("ADA").

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(e) D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

On July 29, 2009, the defendant filed a motion for summary judgment. By order filed on July 30, 2009, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion.

On September 1, 2009 (doc. 84), this court granted the defendant's motion to strike a document that had been filed by the plaintiff on August 12, 2009 (doc. 68). The additional exhibits filed on that date by the plaintiff were not stricken, and this court ruled that the documents would be considered as part of the plaintiff's opposition to the defendant's motion for summary judgment. On August 28, 2009, the plaintiff brought a box of documents and a summary page to the Clerk of Court for filing. The Clerk of Court filed

the plaintiff's "summary" as his response to the motion for summary judgment.  As the box of documents was not organized in any manageable way and contained original documents and duplicates of documents already filed by the plaintiff, this court instructed the plaintiff the box would not be accepted and he would need to resubmit only those documents that he wanted filed by the court.  His deadline for responding to the motion for summary judgment was extended through September 11, 2009.  On that date, the plaintiff filed over 300 documents in opposition to the motion for summary judgment.  On September 18, 2009, the defendant filed its reply, and on September 21, 2009, the plaintiff filed a sur-reply.

## **FACTS PRESENTED**

The plaintiff began his employment with the defendant's predecessor in interest, New South Communications Corp., in 2001 in Systems Entry for the Move/Add/ Change or Delete Department ("MACD").  The plaintiff worked in Systems Entry for approximately two years, entering applications for new orders made by new and existing customers.  In 2003, the plaintiff placed a bid for an open position as a Customer Account Analyst ("CAA").  The plaintiff worked as a CAA reporting to Ann McKenzie for approximately 18 months.  The plaintiff's primary responsibility as a CAA was answering customer telephone calls in the Call Center and generating and handling work tickets associated with billing and other credit questions.  After 18 months of working as a CAA, the plaintiff decided to go back to the Systems Entry position in MACD.  It was the plaintiff's decision to move back to the MACD because he was tired of being on the telephone all the time in the Call Center.  The plaintiff continued to work in Systems Entry for another year, until budget cuts impacted the department.  The plaintiff was transferred at that time to a special project called TRRO.  The plaintiff worked on the TRRO project for another year until the project ended (pl. dep. at 10-14).

At that time, the plaintiff was scheduled to lose his employment with the defendant because the project had ended. Before his employment ended, the plaintiff bid on an open CAA position and interviewed with his former supervisor, Ann McKenzie (pl. dep at 14-15). He was offered the CAA position on May 19, 2006 (pl. dep., ex. 2). Ms. McKenzie discussed with the plaintiff the duties of the CAA and her concerns about his ability to handle the job responsibilities in light of the fact that he had left his previous CAA position because he did not like working the telephones (McKenzie aff. ¶ 3).

The plaintiff had been diagnosed with diabetes in January 2005 (pl. dep. at 101). Ms. McKenzie was aware of his diabetes at the time that she offered him the CAA position in May 2006. According to Ms. McKenzie's testimony, it had no impact on her decision to offer him the position as she had one other employee working for her at that time who was diabetic (McKenzie aff. ¶ 4). The plaintiff's primary responsibility as a CAA was to take calls, work the tickets, issue credits if they were valid, and handle billing questions from current NuVox customers. The plaintiff was responsible for logging certain information into the computer system to create a work ticket. It was the plaintiff's responsibility to document the name of the caller, the business name and the caller's issue, and to log in and open a work ticket and attempt to address the customer's issue. If a customer's question could be answered without opening a work ticket, it was still the plaintiff's responsibility to note in the computer system the name of the caller, the business name, the caller's issue, and whether the issue had been addressed. If the plaintiff could not address the customer's issue directly, it was his responsibility to transfer the caller to the appropriate representative who could assist the caller. The plaintiff was required to provide a "warm transfer" when transferring a customer to another representative. A warm transfer occurs when the CAA lets the caller know that they are being transferred and tells them to whom they are being transferred, and stays on the line during the transfer. The opposite of a "warm transfer" is

3

a "cold transfer," where the caller is transferred without any interaction and without the CAA remaining on the line (pl. dep. at 18-20).

During the plaintiff's second stint as a CAA, his scheduled shift was 8:30 a.m. to 5:30 p.m., Monday through Friday. There were approximately 10-12 employees working in his department. The Call Center was a rotating queue in which each incoming call rotated to the next available CAA. Proper documentation of each call was particularly important, because in order for a representative to figure out what a customer's issue was and how it had previously been addressed and handled, the proper documentation had to have been entered in the computer system. Moreover, when a call was transferred to another representative or another representative was handling a work ticket, that representative needed to understand what was done previously in order to properly address the situation. As a CAA, the plaintiff was the voice of the defendant, and his treatment and handling of customers who called into the billing queue was a critical aspect of his job duties (pl. dep. at 20-21, 37).

The plaintiff sent an email to Ms. McKenzie on October 9, 2007, indicating that he was looking to move to another position and that he felt he had honored his time in the CAA position (pl. dep., ex. 3). The plaintiff testified during his deposition that his insurance was not covering some of his new medication, and he was interested in a job position that would pay more (pl. dep. at 22-23). As noted above, the plaintiff had been diagnosed with diabetes in 2005, and his diabetic condition was well-known to the employees in the department, including Ms. McKenzie and his direct supervisor, Candace Campbell (pl. dep. at 24, 30). There is nothing in the email of October 9, 2007, that indicates that the plaintiff's desire to seek other employment opportunities was related in any way to his diabetes. The email does reference that the plaintiff does not like "today's changes at all" (pl. dep., ex. 3). The plaintiff could not recall during his deposition exactly what the changes were, but he did state that the changes were departmental changes that applied to everyone (pl. dep. at

4

25-26). Ms. McKenzie believed that the plaintiff's desire to look for another position was because he was frustrated and burned out with the telephones, as he had been in 2003 (McKenzie aff. ¶ 5).

On November 6, 2007, the plaintiff received a performance improvement plan outlining a number of issues with his performance that needed immediate improvement. These issues included: lack of proper documentation and the need to more thoroughly research and analyze the need for providing customer credits and document the reasons for issuing customer credits. The plaintiff was also informed that he needed to keep his personal time to a minimum (pl. dep., ex. 8). Specific improvements included the following:

> Competency: Problem Solving/judgment. Specific improvement required: Learn to look at all sides of an issue. Learn where to gain certain pieces of information and compile it and analyze it to look for the best possible answer.
>
> Competency: Make effective decisions. Specific improvement required: Know when to issue a courtesy credit and when to calculate it down to the penny. Know when a credit under a certain limit can be approved or needs to go through audit.
>
> Competency: Productivity: Specific improvement required: Michael will take 13-14 minutes of personal time in the morning and afternoon on top of break time. Personal time needs to be kept to a minimum.

(Pl. dep., ex. 8; Campbell aff., ex. 1).

The plaintiff reviewed the performance improvement plan with his supervisor, Ms. Campbell, and signed off on the plan on November 6, 2007 (pl. dep., ex. 8). According to Ms. Campbell, after the plaintiff reviewed the plan and signed off on it, he told her for the first time that one of the reasons he was taking so many breaks was because of his diabetes medication. Ms. Campbell testified that she told him this was fine and that if he was having issues due to his health to let her know (Campbell aff. ¶ 5). The plaintiff claims that after their discussion, Ms. Campbell's response was "Okay. Fine. If there's anything else, go back to your post." He stated that his understanding was that he could not go to the

5

restroom when he needed to do so (pl. dep. at 47). The plaintiff received no further discipline related to excessive personal breaks (pl. dep. at 47; Campbell aff. ¶ 6).

In 2007, NuVox merged with Florida Digital Network ("FDN"). The merger began in May 2007 and was finalized in December 2007. One of the reasons Ms. McKenzie hired Ms. Campbell was because Ms. McKenzie's job responsibilities increased as a result of the merger to include the billing queue in Maitland, Florida. Once the Maitland billing location was added, the call volume and work load for all the CAAs, including the plaintiff, increased. On December 26, 2007, when the Maitland billing queue was merged with the NuVox billing queue, Ms. Campbell instructed the CAAs not to transfer calls to the general Maitland billing queue, because that queue no longer existed and those transferred calls would just be routed to another CAA within Ms. Campbell's department (pl. dep. at 54-55; Campbell aff. ¶ 7). Despite Ms. Campbell's instructions, the plaintiff admits he continued to transfer calls to the Maitland extension on December 26 and 27. According to the plaintiff, other CAAs also continued to transfer calls to the Maitland extension (pl. dep. at 54-55, 58, ex. 10; Campbell aff. ¶¶7-8).

The plaintiff received a second performance improvement plan on January 11, 2008, for transferring calls back into the Maitland billing queue after being instructed to stop, for unauthorized use of the internet, and for failing to properly log calls into the FDN computer system (pl. dep., ex. 10). This was the second time the plaintiff had been disciplined for failing to properly document call information into the computer system (pl. dep., ex. 8, 10). The plaintiff acknowledges that he was frustrated and burned out with talking to customers on the telephone at this time (pl. dep. at 69-70).

The plaintiff submitted two emails from January 2008 that he sent to Jim Akerhielm[1] (doc. 70-1). In a January 11, 2008, email, the plaintiff took exception with the

---

[1]This court has been unable to ascertain Mr. Akerhielm's title from the parties' filings. Presumably, he is a manager for the defendant.

final written warning that he received on that date. He stated, "The allegations that are true are due to misrepresentation, ineffective training and close to non-existent support and the management in this department is deplorable." At the end of the email, he stated, "All I wanted was to move to a department making more money to pay for my bills and my meds but now I am stuck unless I leave." In a January 14, 2008, email to Mr. Akerhielm, the plaintiff complained about the management style in his department and that the department was run on "fear and intimidation." At the end of the email, the plaintiff stated that he wanted a better paying and less stressful job. The plaintiff also stated in the email that his doctor had increased his diabetes medication, which made him go to the restroom more often. He stated that Ms. Campbell "wrote [him] up for spending too much time in there – and [he] had to cease taking [the medication] because of the writeup" (doc. 70-1).

The plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 3, 2008, alleging that his first and second performance improvement plan write-ups were discriminatory because his employer regarded him as disabled in violation of the ADA (pl. dep., ex. 21).

The plaintiff was also responsible for performing contract reviews (known as CONREVs) in early 2008. CONREVs involved reviewing a new customer's contract and their first bill to ensure that the contract terms and the billing terms matched. This review was important to ensure that the customer's first bill was accurate and thus each subsequent bill would be accurate. These CONREVs were to be performed whenever there was downtime in the billing queue and the CAA had time available. The plaintiff was not the only CAA responsible for performing CONREVs. There were at least five other CAAs also performing CONREVs (pl. dep. at 40-42).

During the April time frame, CONREVs were more difficult because some of the software licensing tools, which assisted Ms. Campbell in determining the contracts to be reviewed, had not been renewed. This resulted in multiple people trying to work the

7

same contract list. While this made it more difficult for the CAAs to perform their job duties, this applied to everyone equally in the department. Ms. Campbell and Ms. McKenzie knew that it was difficult on the CAAs, and they asked the CAAs to do the best they could (pl. dep. at 65-66).

The plaintiff received his third performance improvement plan on April 24, 2008, for failing to perform CONREVs (pl. dep., ex. 17). The plaintiff received the performance improvement plan because call volume had been low on April 16, and, while other representatives had been performing CONREVs, the plaintiff had performed none on that day (pl. dep., ex. 16, 17; Campbell aff. ¶ 10).

The April 24, 2008, performance improvement plan also counseled the plaintiff for disregarding the chain of command (pl. dep., ex. 17). According to Ms. McKenzie's testimony, the plaintiff was counseled regarding proper use of the chain of command because he had been repeatedly taking issues to her and bypassing his immediate supervisor, Ms. Campbell (McKenzie aff. ¶ 8). On April 16, 2008, the plaintiff was frustrated with the CONREV process and voiced his concerns in an e-mail to Ms. McKenzie (pl. dep., ex. 14). Ms. McKenzie advised the plaintiff that Ms. Campbell was in charge of the CONREV process and that he should "funnel questions to her" (pl. dep., ex. 14). The plaintiff argues that when he was rehired by Ms. McKenzie, she told him that he would report to her (pl. dep. at 17). Ms. McKenzie does not recall this comment being made, but if the statement was made, it was prior to the FDN merger and prior to Ms. McKenzie's hiring of Ms. Campbell.

The plaintiff was terminated on May 9, 2008, for failing to properly document calls and for failing to perform warm transfers on customer calls (pl. dep. at 86, ex. 19, 20). This was the fourth disciplinary action the plaintiff had received within six months (Campbell aff. ¶ 11). Craig Roper, Quality Monitor, had monitored the plaintiff's calls on May 8, 2009 (pl. dep. at 86-87). Mr. Roper's job duties included periodically monitoring and reviewing all

8

CAA calls (pl. dep. at 87). During the May 8, 2008, quality assurance review, the plaintiff repeatedly failed to gather the necessary information to properly document calls and was continually cold transferring callers, instead of providing a warm transfer (pl. dep., ex. 19, 20).

Ms. McKenzie testified that two other diabetics are employed as CAAs. Neither of these persons received performance improvement plans in the fall of 2007 and spring of 2008, and both are still employed with the defendant (McKenzie aff. ¶ 9).

The plaintiff filed a second charge of discrimination on May 9, 2008, alleging that his third performance improvement plan, which was issued on April 24, 2008, was issued in retaliation for filing his initial charge of discrimination (pl. dep., ex. 22). The plaintiff was issued a right-to-sue notice by the EEOC on October 6, 2008 (pl. dep., ex. 23). This lawsuit followed.

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been

raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## ANALYSIS

In his complaint, the plaintiff alleges claims against the defendant for failure to reasonably accommodate his diabetes medication, retaliation, retaliatory discharge, and disparate treatment, all in violation of the ADA. The plaintiff's first EEOC charge filed on March 3, 2008, alleged that his first and second performance improvement plan write-ups were discriminatory because his employer regarded him as disabled in violation of the ADA (pl. dep., ex. 21). His second charge, filed on May 9, 2008, alleged that the third performance improvement plan was issued in retaliation for filing his initial charge of discrimination (pl. dep., ex. 22). As the plaintiff did not include claims regarding reasonable accommodation and retaliatory discharge in the EEOC charges, the defendant argues that the plaintiff's claims of discrimination exceed the scope of his charges, and thus those claims are procedurally barred.

"A claim omitted from an EEOC charge may only be raised where the claim is 'reasonably related to the allegations and claims in the administrative charge or, if disclosed, the omitted claim could reasonably be expected to follow from the administrative investigation based on the deficient administrative charge.'" *Baradell v. Board of Social Services*, 970 F. Supp. 489, 493 (W.D. Va. 1997) (quoting *Nicol v. Imagematrix, Inc.*, 767 F. Supp. 744, 753 (E.D. Va.1991)). Here, this court cannot say that the plaintiff's omitted claims could not reasonably be expected to follow from the administrative investigation based upon his administrative charges. Furthermore, a plaintiff asserting a claim of retaliation for filing a previous EEOC charge need not exhaust administrative remedies before suing in federal court. *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992). Based upon the foregoing, this court will consider the claims on the merits.

*ADA*

The ADA prohibits an employer with 25 or more employees from discriminating "against a qualified individual on the basis of disability . . . ." 42 U.S.C. §12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* §12111(8). The statute defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* §12102(2).

*Reasonable Accommodation*

In a failure to accommodate case under the ADA, to prove a *prima facie* case, the plaintiff must show that (1) he was an individual who had a disability within the meaning of the statute; (2) the defendant had notice of his disability; (3) with reasonable accommodation he could perform the essential functions of the position; and (4) the defendant refused to make such accommodations. *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2nd Cir.1999)).

The plaintiff was diagnosed with diabetes in January 2005 (pl. dep. at 101). The plaintiff testified that his supervisors and everyone else in the department was aware of his diabetes (pl. dep. at 24, 30). At no time did the plaintiff ever discuss with Ms. McKenzie or anyone else at NuVox that he needed a reasonable accommodation in order to perform the essential functions of his job (McKenzie aff. ¶ 5; Campbell aff. ¶ 4). The plaintiff offers two emails to Ms. McKenzie dated October 9 and October 11, 2007, for support that the defendant denied him a reasonable accommodation (doc. no. 70-1). However, the plaintiff did not mention his diabetic condition – or any other health issues –

in either the October 9 or October 11 emails. As argued by the defendant, the plaintiff cannot stand behind these two emails that do not even mention his diabetes and use them to argue that the defendant failed to provide him the opportunity to communicate his need for a reasonable accommodation.

The plaintiff received a performance improvement plan write-up on November 6, 2007, which included performance deficiencies for failing to properly research and document work tickets, failing to perform the proper audit process when issuing credit amounts, and failing to contact customers once a resolution had been reached (pl. dep., ex. 8; Campbell aff., ex. 1). At the conclusion of the performance improvement plan, the plaintiff's supervisor mentioned that he had been taking 13-14 minutes of personal time in the morning and afternoon, on top of break time. She indicated that personal time needed to be kept to a minimum (pl. dep., ex. 8). According to the plaintiff, he informed Ms. Campbell that he had been taking excessive personal breaks because the new diabetes medication he had been prescribed increased the need for bathroom breaks (pl. dep. at 29-30). He never discussed his need to take extra bathroom breaks or his change in medication with Ms. McKenzie or Ms. Campbell prior to November 6, 2007 (pl. dep. at 29-30, 47). The plaintiff alleges that when he tried to discuss this issue with his supervisor on November 6, her response was "Okay. Fine" (pl. dep. at 47).

There is no evidence to support a finding that the defendant failed to reasonably accommodate the plaintiff's diabetes. There is no evidence in the record that Ms. Campbell, Ms. McKenzie, or any other manager with the defendant denied the plaintiff access to the restroom. Moreover, he was never again counseled or disciplined during his employment concerning the length of his breaks after he told his manager the reason for the length of his breaks (pl. dep. at 47). The plaintiff never discussed his medication with Ms. Campbell or Ms. McKenzie after November 6 (pl. dep. at 47; Campbell aff. ¶ 6).

13

The plaintiff testified during his deposition that starting in the fall of 2007 he was looking for other employment opportunities and "the sole reason for wanting to move" was to make more money to help cover his medications (pl. dep. at 22, 24). The plaintiff submitted two emails from January 2008 that he sent to Mr. Akerhielm (doc. 70-1). In a January 11, 2008, email, the plaintiff took exception with the final written warning that he received on that date. He stated, "The allegations that are true are due to misrepresentation, ineffective training and close to non-existent support and the management in this department is deplorable." At the end of the email, he stated, "All I wanted was to move to a department making more money to pay for my bills and my meds but now I am stuck unless I leave." In a January 14, 2008, email to Mr. Akerhielm, the plaintiff complained about the management style in his department and that the department was run on "fear and intimidation." At the end of the email, the plaintiff stated that he wanted a better paying and less stressful job (doc. 70-1). As argued by the defendant, there is no legal obligation under the ADA to promote an individual or increase an individual's compensation to accommodate an employee's increased medical costs associated with a disability. The plaintiff also stated in the email that his doctor had increased his diabetes medication, which made him need to go to the restroom more often. He stated that Ms. Campbell "wrote [him] up for spending too much time in there – and [he] had to cease taking [the medication] because of the writeup" (doc. 70-1). However, as discussed above, at the time the November 6, 2007, performance improvement plan was issued, the plaintiff told Ms. Campbell for the first time that he needed more time in the restroom because of his medication. He testified that her response was, "Okay. Fine" (pl. dep. at 47). There is no evidence that the plaintiff was prevented from taking bathroom breaks, and he received no further discipline related to excessive personal breaks (Campbell aff. ¶ 6).

There is no evidence in the record that the plaintiff's failure to meet the performance expectations, which resulted in the issuance of three performance

14

improvement plans between November 2007 and April 2008, was based on his diabetes. Furthermore, the plaintiff has not shown that the defendant failed to reasonably accommodate his diabetes. Accordingly, summary judgment is appropriate on this claim.

*Disparate Treatment*

To prove a disparate treatment claim under the ADA, the plaintiff must satisfy the burden shifting standard set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973). The plaintiff must first establish a *prima facie* case of discriminatory discipline. If the defendant comes forward with legitimate, nondiscriminatory reasons for issuing the performance improvement plans, the plaintiff must then present evidence that the defendant's reasons were merely a pretext to mask unlawful discrimination. In order to establish a *prima facie* case of discriminatory discipline, the plaintiff must prove that (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he was disciplined; and (4) individuals outside the protected class who engaged in the same or similar misconduct were not disciplined. *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002).

As argued by the defendant, the plaintiff cannot satisfy the *prima facie* case as he has not shown evidence that he was performing his job in a satisfactory manner at the time of the discipline, and he has not shown that individuals outside the protected class who engaged in the same misconduct were treated more favorably. The evidence before the court shows that the plaintiff was written up on three different occasions for poor job performance. The plaintiff was issued a performance improvement plan on November 6, 2007, for issues including lack of proper documentation and the need to more thoroughly research and analyze the need for providing customer credits and document the reasons for issuing customer credits (pl. dep., ex. 8). He was issued a second performance improvement plan, identified as a final written warning, on January 11, 2008, for transferring

15

calls back into the Maitland billing queue after being instructed to stop, for unauthorized use of the internet, and for failing to properly log calls into the FDN computer system (pl. dep., ex. 10). The plaintiff argues that he was not the only person to transfer calls back into the Maitland billing queue but that he was the only one disciplined. However, he has failed to present any evidence of his claim.

Despite receiving two performance improvement plans in less than three months, the plaintiff was not terminated on April 24, 2008, but received a third performance improvement plan for failing to perform contract reviews during low call volume and disregarding the chain of command (pl. dep., ex. 17). At no time did the plaintiff indicate to Ms. Campbell or Ms. McKenzie that he was having difficulty performing his job duties in a satisfactory manner because of his diabetes.

Furthermore, the plaintiff has offered no evidence of pretext to overcome the defendant's legitimate, nondiscriminatory reasons for issuing the performance improvement plans. The plaintiff has failed to show any evidence that the performance improvement plans were in any way related to his health issues. Based on the evidence in the record, a reasonable fact finder could not conclude that the plaintiff was disciplined because of his diabetes. The plaintiff's repeated performance problems stemmed from his failure to properly document calls, failure to warm transfer customers to other representatives, and failure to perform contract reviews. There is nothing in the record that indicates that his diabetes had an impact on any of these job performance deficiencies. Accordingly, the plaintiff's claim that the performance improvement plans were discriminatory in violation of the ADA should be dismissed.

*Retaliation*

ADA retaliation claims are evaluated under the burden shifting rules established by the Supreme Court in *McDonnell Douglas Corp*. 411 U.S. at 802. *Bateman*

16

*v. American Airlines, Inc.*, 614 F.Supp.2d 660, 675-76 (E.D. Va. 2009). In order to establish a *prima facie* case of retaliation under the ADA, the plaintiff must show: (1) he engaged in protected activity; (2) his employer took adverse action against him; and (3) there existed a causal connection between the protected activity and the adverse action. *Parkinson v. Anne Arundel Medical Center*, 79 Fed. Appx. 602, 604 (4th Cir. 2003) (citing *Rhoads*, 257 F.3d at 392).

Even assuming the plaintiff can establish a *prima facie* case of retaliation based on the temporal proximity of the March 3, 2008 charge of discrimination and the April 24, 2008, performance improvement plan, the plaintiff cannot show that the defendant's stated reasons for the performance improvement plan were pretext for discrimination. The evidence in the record shows that the plaintiff was given the April 24, 2008, performance improvement plan because he failed to perform CONREVs and disregarded the defendant's chain of command (pl. dep., ex. 17). As set forth above, CONREVs were part of the plaintiff's job responsibilities in early 2008. They were supposed to be performed whenever there was downtime in the billing queue and the CAA had time available (pl. dep. at 40-41). The evidence is uncontradicted that the plaintiff failed to perform any contract reviews on April 16 when the call volume was low and other representatives had been performing CONREVs (pl. dep., ex. 16; Campbell aff. ¶ 10). The plaintiff was also counseled during the April 24 performance improvement plan for disregarding the chain of command. The plaintiff was frustrated with the CONREV process and had voiced his concerns in an e-mail to Ms. McKenzie, bypassing his immediate supervisor, Ms. Campbell (pl. dep., ex. 14). The plaintiff offers no evidence that the defendant's reasons for giving him the performance improvement plan were pretext for retaliation for the filing of his charge of discrimination.

The plaintiff also cannot meet his burden of proof with regard to his retaliatory discharge claim. The first two performance improvement plans were both issued prior to the

17

plaintiff filing his charge of discrimination on March 3, 2008. Further, the plaintiff acknowledges that he did not perform any contract reviews on April 16, which resulted in his April 24 performance improvement plan discussed above (pl. dep., ex. 16). After previously receiving three performance improvement plans in six months, the plaintiff repeatedly failed to obtain the customer name, business name, and billing address on multiple calls monitored by the Quality Monitor, Craig Roper, on May 8, 2008 (pl. dep., ex. 20). The plaintiff offers no evidence that Mr. Roper had any knowledge that he had filed a charge of discrimination against the defendant. Knowledge of one's protected activity is "absolutely necessary" to establish the third element of a *prima facie* case of retaliation. *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998). Based upon the foregoing, the plaintiff has failed to meet his burden of proof with regard to his retaliatory discharge claim. Accordingly, summary judgment is appropriate on the plaintiff's retaliation claims.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court finds that the evidence is such that a reasonable jury could not return a verdict for the plaintiff on any of his claims. Accordingly, it is recommended that the defendant's motion for summary judgment (doc. 57) be granted. All pending nondispositive motions will be held in abeyance pending the district court's disposition of the motion for summary judgment. Should the district judge adopt this court's recommendation, the motions will be rendered moot.

                                                               s/William M. Catoe
                                                               United States Magistrate Judge

October 30, 2009

Greenville, South Carolina